UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ONLINE PUBLICATION ONLY

JUAN M. CRUZ,

                                   Plaintiff,

- versus -

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                                   Defendant.

MEMORANDUM
AND ORDER
13-CV-5251

A P P E A R A N C E S:

    HERBERT S. FORSMITH
        26 Broadway, 17th Floor
        New York, NY 10004
        *Attorney for Plaintiff*

    LORETTA E. LYNCH
        United States Attorney
        Eastern District of New York
        271 Cadman Plaza East
        Brooklyn, NY 11201
    By:    Matthew Silverman, Assistant U.S. Attorney
        *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

        Juan M. Cruz seeks review of the Social Security Administration's decision denying him disability benefits. Cruz alleges that he has been left unable to work by conditions stemming from a 2009 stroke, including depression and problems in his left arm. An administrative law judge ("ALJ") found that although Cruz had established some impairment, he retained enough residual functional capacity to do some kinds of work (though not his previous work as a repairman). Because I find that the ALJ's decision is supported by substantial

evidence and does not rest on legal error, the Commissioner's motion for judgment on the pleadings is granted, and Cruz's is denied.

## BACKGROUND

A.  *Medical Background*

Cruz was born in the Dominican Republic in 1960 and moved to the United States in 1979. R. 57-58.[1] Cruz worked as a handy man in an apartment building for many years. R. 68-70, 257.

On May 2, 2009, Cruz complained of a headache and was diagnosed with a left-side cerebellar hemorrhage secondary to malignant hypertension; he underwent a suboccipital craniotomy the next day. R. 300. Cruz did well after the surgery and was discharged to rehabilitation on May 14, 2009, but after he left he complained of a left-side headache and went to the emergency room at Montefiore Medical Center for evaluation of a cerebellar hemorrhage. R. 300, 316. A neurosurgeon performed an examination and a CT scan and found that although Cruz was neurologically intact and stable, he had a left cerebellar bleed at the site of the previous surgery. R. 325. He recommended continued monitoring by repeat CT scan, and also treatment for Cruz's continuing high blood pressure. *Id*. Cruz was admitted for monitoring and blood pressure control, and his condition improved. After physical therapy, Cruz was able to walk normally. He was discharged on May 21. R. 300.

Cruz saw a renal specialist, Michael Guccione, on June 24, 2009, who found that Cruz's blood pressure was well-controlled with medication. R. 456-58. Guccione adjusted Cruz's medications and recommended a low-sodium diet.

---

[1] Citations of the form "R." are to the administrative record, filed as ECF No. 7.

On July 1, 2009, Cruz went to Buxton Family Practice for a follow-up. He denied headaches, clumsiness, and denied any changes in hearing, vision, or speech, R. 369, but complained of left shoulder pain, and the examiner noted decreased range of motion and 4/5 strength, as well as crepitus, in the shoulder. R. 370. The examiner diagnosed status post CVA (cerebrovascular accident), rule out left capsulitis/rotator cuff syndrome (that is, that further investigation would be required to rule out those conditions), and also diagnosed hypertension. *Id*. Follow-up X-rays of Cruz's left shoulder revealed mild periarthritis. R. 376. A CT scan of Cruz's head showed no acute hemorrhage or infarction. R. 377.

Cruz returned to Buxton a week later. He denied headaches, but he had not yet obtained the drugs prescribed for his shoulder pain, and he repeated that his shoulder still hurt. R. 372. Furthermore, because Cruz was supposed to testify in court, a doctor recommended that based on his history of stroke and headaches, he should not sit for more than three hours a day. *Id*.; *see also* R. 375.

Cruz reported to Buxton again on November 24, 2009 for a disability evaluation. He did not report headaches, dizziness, weakness, chest pain, shortness of breath, or palpitations, but he did report left shoulder pain, and he had decreased strength and movement in his left shoulder. R. 373-74. The doctor diagnosed left rotator cuff syndrome/capsulitis and uncontrolled hypertension, and recommended that the plaintiff follow up with an evaluation by a neurologist to decide whether he could return to work.

On November 30, 2009, Cruz went to an adult clinic at Elmhurst Hospital Center to refill his medications. He denied any headaches or dizziness. R. 408-09. When he returned on December 28, 2009, he reported feeling well and had no weakness from his stroke. A doctor

found normal neurological and musculoskeletal results and diagnosed hypertension with stroke in the past, and advised Cruz to continue his blood pressure management regimen. R. 412-14.

Vinod Thukral performed a consultative internal medicine examination of Cruz on January 16, 2010. Cruz denied any history of headaches, dizziness, photophobia, or blurred vision, but he did report constant left arm and left leg pain exacerbated by moving and lifting and relieved by pain medications. Cruz said that he walked with a cane that had been prescribed by a family doctor a few months before, but Thukral opined that Cruz did not need it to walk normally. R. 357. He had full ranges of motion and strength in all of his extremities, and he had no motor or sensory deficits. R. 358-59.

In April of 2010, Cruz saw Dr. Ramon Pimentel about his blood pressure and cardiovascular system, and Dr. Pimentel cleared him to work. R. 443. At a return visit to the same doctor in January 2011, he diagnosed back pain and uncontrolled hypertension. R. 446.

Cruz went to the Elmhurst clinic again on March 29, 2011, to establish a primary care relationship; he complained of loss of sensation in his left fingertips and depression because he lost his job and his mother was sick. R. 400-02. Dr. Gregory Stryjewski diagnosed hypertension and status post intracerebral hemorrhage, which was asymptomatic and had left no residual symptoms. A CT scan on May 2, 2011 showed no evidence of acute parenchymal hemorrhage or ischemia, but revealed some irregularity that was presumed to be the result of his 2009 procedure. R. 387.

A consultative psychologist, Dmitri Bougakov, Ph.D., evaluated Cruz on July 27, 2011. Cruz reported that he had trouble falling asleep, cried periodically, and had poor appetite, low energy, and social withdrawal. R. 418. He performed chores himself, managed money, and took public transportation. R. 420. He appeared oriented to time and place, but when asked

4

what month it was he said September. Cruz had difficulty counting forward and backward and remembering objects. R. 419. Bougakov reported that Cruz would not be able to follow simple instructions or perform simple tasks, maintain concentration, make appropriate decisions, or deal with others; critically, Bougakov reported that "[h]is difficulties exhibited during performance on task is related to symptom exaggeration." R. 420. Bougakov found that Cruz was mildly depressed, R. 423, but he declined to assess Cruz's ability to perform instructed tasks because his symptoms were "extremely disproportionate to his background," and were "likely related to symptom exaggeration." R. 422.

Also on July 27, 2011, Dr. Marilee Mescon examined Cruz as a consultative medical expert. Mescon noted that Cruz could walk normally without a cane. His left extremities showed decreased strength and range of motion, and decreased sensory perception, but his right extremities were intact. R. 431. However, deep tendon reflexes were normal, and the muscles had not atrophied. *Id.* Mescon diagnosed a history of cerebellar bleed with left hemiparesis and left hemisensory loss, with a poor prognosis for recovering full neurological function. R. 432. As a consequence, Mescon found that Cruz was limited in his ability to manipulate objects with his left arm. Mescon also found that Cruz would need a cane to walk. R. 434.

During Cruz's December 7, 2011 hearing before the ALJ, a medical expert, Dr. Gerald Galst, testified about the record evidence. He opined that Mescon's diagnosis was not consistent with the other medical evidence, and that the conditions Mescon described would be explained only by a previously undiagnosed *right*-side stroke, for which there was no evidence. R. 91-92.

5

B.        *Procedural History*

On August 3, 2009, Cruz applied for disability insurance benefits and SSI with an alleged onset date of May 2, 2009 (the day of his stroke); his application was given a protective filing date of July 6, 2009. R. 220, 241. The application was denied at the initial administrative level, and Cruz requested a hearing before an ALJ. R. 141-51. ALJ Seth I. Grossman held a hearing on June 3, 2011, and continued the hearing date (in order to receive additional records) to December 7, 2011. R. 44. The ALJ denied benefits in a written decision dated December 23, 2011. R. 21-33. The Appeals Council denied review on July 23, 2013, *see* R. 1-9, and Cruz brought this action on September 20, 2013, *see* Complaint, ECF No. 1.

DISCUSSION

A.        *The Legal Standards*

A claimant seeking disability insurance benefits must establish that, "by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months," 42 U.S.C. § 1382c(a)(3)(A), she "is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy," *id.* § 1382c(a)(3)(B).

The Social Security regulations direct a five-step analysis for the Commissioner to evaluate disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an

6

> impairment, the [Commissioner] will consider him disabled
> without considering vocational factors such as age, education, and
> work experience; the [Commissioner] presumes that a claimant
> who is afflicted with a "listed" impairment is unable to perform
> substantial gainful activity. Assuming the claimant does not have
> a listed impairment, the fourth inquiry is whether, despite the
> claimant's severe impairment, he has the residual functional
> capacity to perform past work. Finally, if the claimant is unable to
> perform his past work, the [Commissioner] then determines
> whether there is other work which the claimant could perform.

*DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (internal quotation marks omitted) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)); *see also* 20 C.F.R. § 404.1520(a)(4)(i)-(v) (setting forth this process). The claimant bears the burden of proof in the first four steps, the Commissioner in the last (but only to show that jobs exist in the national or local economies that the claimant can perform given her RFC and vocational factors). *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003); 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003).

The Commissioner decides whether the claimant is disabled within the meaning of the Act. 20 C.F.R. § 404.1527(e)(1). Under 42 U.S.C. § 405(g), I review the Commissioner's decision to determine whether the correct legal standards were applied, and whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). If the record contains evidence which "a reasonable mind might accept as adequate to support [the Commissioner's] conclusion," this Court may not "substitute its own judgment for that of the [Commissioner] even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (quotation marks omitted).

B.       *Application*

Cruz raises a number of issues with the ALJ's decision. Only some of these arguments are raised with sufficient depth for me to consider them. (For example, while Cruz's

7

motion makes passing reference to the ALJ's decision not to use an interpreter, *see* Cruz Br. at 6, the motion does not make clear whether and to what extent Cruz might be seeking relief on this basis.)

First, Cruz argues that the ALJ should have further developed the medical evidence. This includes a contention that, rather than consulting a cardiologist (such as Galst) at the December 7, 2011 hearing, the ALJ should have consulted a neurologist. Cruz's most severe physical symptoms, including loss of some function on his left side, were alleged to be the result of a stroke, and a neurologist would have been better able to evaluate the medical evidence. In particular, a neurologist would have been better equipped to assess Dr. Mescon's opinion that Cruz suffered from a history of cerebellar stroke with left hemiparesis and left hemisensory loss, and that Cruz had a poor prognosis for recovering full neurological function.

Although I agree that it might have been preferable to consult a neurologist, Cruz does not demonstrate why it was improper for the ALJ to rely on the opinion of Dr. Galst. He does not point to any internal inconsistency or inability to comprehend the medical evidence. Moreover, Mescon is an internist – that is, qualified to practice internal medicine – and it is not disputed that Galst is also board-certified in internal medicine (as well as cardiology, his specialty). R. 81-82.[2]

Second, Cruz argues that the ALJ "did not address" his psychological and mental condition; this seems to include the contention that the ALJ did not properly evaluate Cruz's claims of pain and inability to function independently. Even if Cruz is correct that exaggeration of other symptoms may be caused by depression, it is not true that the ALJ here used Cruz's

---

[2] I also agree with the Commissioner that, to the extent the ALJ failed to follow the Hearings, Appeals and Litigation Law Manual (or "HALLEX") by failing to request the consultants' credentials, this does not constitute legal error. *See Harper v. Comm'r of Soc. Sec.*, 08-CV-3803 NGG, 2010 WL 5477758, at *4 (E.D.N.Y. Dec. 30, 2010).

apparent exaggeration as the sole basis to discount his claims of pain. The ALJ found that by Cruz's own admission, his depression only mildly affected his daily activities. *See* R. 23-25. Cruz does not dispute that he can bathe and feed himself, go to the grocery store, and go for walks; that he socializes freely; and that he has had no major episodes of decompensation. With respect to Cruz's concentration, persistence, and pace, the ALJ permissibly found that Cruz had exaggerated his symptoms; he relied in part on Bougakov's determination that the depth of limitation Cruz showed was not consistent with his history. The ALJ also noted that those symptoms had appeared suddenly at the time he made his claim of disability. R. 24-25. Finally, the ALJ noted that the primary basis of Cruz's claim for disability was his physical condition, not any mental problem. On the whole, Cruz did not demonstrate that his pain or his alleged mental impairments were significant impediments to work.

For similar reasons, I reject Cruz's argument that the ALJ improperly evaluated his credibility. In finding Cruz only partially credible, *see* R. 30, the ALJ reasonably relied on the record evidence, including Cruz's ability to exercise on a treadmill to achieve 94% of his maximum heart rate and the absence of medical treatment (including medication and physical therapy) for his allegedly serious shoulder pain and disability. I also agree with the government that Cruz has not identified any prejudice from the ALJ's credibility determination.

Third, Cruz contests the ALJ's reliance on the testimony of a vocational expert that Cruz would be able to perform light work, such as a school crossing guard or school bus monitor, or sedentary work, such as surveillance systems monitor. Cruz is correct that an ALJ must tailor hypothetical questions about a claimant's ability to perform a job to the specific impairments the claimant has. *See, e.g., Priel v. Astrue*, 453 F. App'x 84, 87-88 (2d Cir. 2011) (unpublished) (citing *Dumas v. Schweiker,* 712 F.2d 1545, 1554 (2d Cir. 1983)). Here, the ALJ

9

did just that by limiting his hypothetical to a worker with no transferrable skills, able to perform light work, who could not use his left extremity at all. *See* R. 114-15. As the Commissioner points out, the ALJ actually found that Cruz would be less limited than that, since he would have some use of his left arm.

In short, the Commissioner's decision is supported by substantial evidence and is free of legal error. Cruz's arguments depend heavily on the medical evaluation of Dr. Mescon, but the ALJ reasonably discounted Mescon's opinion. Mescon's assessments of Cruz's motor functioning were not consistent with any other doctor's. *See, e.g.,* R. 85. As Galst testified at the December 7 hearing, the impairments Mescon found, if neurologically caused, would have been explained not by the stroke that Cruz indisputably already had, but by a different stroke – one on the *right* side of Cruz's brain – that had otherwise gone undetected. R. 91-92. The ALJ therefore reasonably concluded, *see* R. 29, that Mescon had misdiagnosed Cruz's rotator cuff problem as a neurological problem, which was also Galst's conclusion. *See, e.g.,* R. 106. Cruz also relies on portions of Bougakov's evaluation (namely, the findings that Cruz would have difficulty carrying out even simple tasks), but he ignores Bougakov's additional opinion that Cruz's apparent impairments were inconsistent with his history and therefore likely exaggerated. In both instances, the ALJ reasonably chose not to rely on the record excerpts on which Cruz bases his argument.

CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is granted, and Cruz's cross-motion is denied.

So ordered.

John Gleeson, U.S.D.J.

Dated: April 18, 2014
      Brooklyn, New York